IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**UNITED STATES OF AMERICA**

-vs-                                                                                          **CAUSE NO.  A-09-CR-128-SS**

**JOE LEE HOUSTON (1)**
**SPENCER HEMPHILL (2)**
_____

### ORDER

BE IT REMEMBERED on August 5, 2010 the Court held a hearing in the above-styled and numbered cause, and the parties appeared through counsel.  Before the Court were Defendant Joe Lee Houston's ("Houston") Motion to Suppress [#16], Houston's Motion to Continue [#49], Houston's Motion to Sever [#56], and Defendant Spencer Hemphill's ("Hemphill") Motion to Suppress [#52]. The Court entered oral orders at the hearing and, having considered the aforementioned documents, the case file as a whole, the applicable law, and the evidence and arguments presented at the hearing, confirms those orders here.

### Background

**I.    Procedural Background**

Defendants Houston and Hemphill (collectively, "Defendants") were indicted in a second superseding indictment on July 20, 2010 for (1) conspiracy to possess with intent to distribute a mixture or substance containing more than 5 grams of a detectable amount of cocaine base in violation of 21 U.S.C. §§ 846, 841(a) and 841(b)(1)(B); (2) possession with intent to distribute a mixture or substance containing more than 5 grams of a detectable amount of cocaine base in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(B); and (3) possession of a controlled substance, a mixture or

substance containing more than 5 grams of a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). *See* 2nd Supersed. Indict. [#44]. On June 1, 2010, Houston filed a motion to suppress the "fruits of an unlawful arrest, search and seizure," and on July 21, 2010, Houston filed a motion to continue. *See* Houston's Mot. Suppress [#16]; Mot. Continue [#49]. On July 27, 2010, Hemphill filed a motion to suppress all physical evidence obtained as a result of the allegedly "unlawfully prolonged detention and search following a traffic stop." Hemphill's Mot. Suppress [#52]. On August 5, 2010, Houston filed a motion for severance from Hemphill. Mot. Sever [#56]. Also on August 5, 2010, the Court held a hearing on all the motions and heard testimony regarding the motions to suppress.

## II.    Factual Findings

At the August 27, 2010 hearing, Officer Clint Hamilton, Sergeant Gary Hanna, Officer Joseph Harris, and Officer Carlos Vallejo of the Austin Police Department ("APD") were all called by the Government to testify about the traffic stop which led to the search of Houston's vehicle and the arrest of Defendants, and the events surrounding it. The Government also submitted its Exhibit 1, a videotape of the stop taken from the dashboard camera in Sgt. Hanna's unit.

Officer Hamilton is a member of the APD's Metro Response South team. He testified that around midnight on the night of February 26, 2009 he was working as a plainclothes officer in a civilian vehicle, and set up surveillance in the parking lot of 2121 East Oltorf Street. He testified he chose to conduct surveillance at that address because APD has made numerous narcotics purchases in the area, it is near an "open-air drug market" (at the intersection of Burton Drive and Oltorf Street) where narcotics are publically bought and sold and have been repeatedly purchased by undercover officers, and many felonies are committed in the area. In short, the area is a known hot spot for crime, especially at that hour.

From his unmarked car, Officer Hamilton saw Defendant Hemphill and a white male walking across the street toward "Clicks Billiards." Hemphill was gesturing, and the white male was reaching into his pocket. It appeared the white male extracted something, but Hamilton could not tell what it was. The two subjects approached the strip mall in which Clicks is located, and walked along a breezeway with concrete pillars which passes in front of the store fronts. The two men stopped behind one of the pillars, stayed for a brief time, and then continued walking. According to Officer Hamilton, Hemphill looked familiar to him; he knew it was someone he had previously arrested for narcotics dealing, but was not sure whether it was Hemphill.

The two men approached a Buick that was parked in the parking lot, facing Clicks. Clicks and some of the restaurants in the strip mall were open, and accordingly the parking lot was fairly busy and Officer Hamilton was able to observe the scene from less than 50 feet away. He testified the parking lot was well-lit, and he had no difficulty observing the men. Hemphill walked to the Buick and got in the passenger side. A white male leaned into the driver's side window, where Defendant Houston was sitting. Officer Hamilton could not tell whether the white male had anything in his hand as he reached into the Buick. However, based on his experience, he believed a narcotics transaction had occurred.

The Buick left the parking lot of Clicks, and immediately turned onto Douglas Street (a dead-end street). Officer Hamilton followed the Buick, and noticed the driver had failed to use the turn signal; thus, he radioed for a uniformed officer to make a traffic stop.[1] Sgt. Gary Hanna responded to the radio call and effected the stop almost immediately.

---

[1] Officer Hamilton testified he did not make an effort to intercept the white male due to a lack of adequate resources.

Sgt. Hanna testified he has been an APD sergeant for about 7 years, and on the night of February 26, 2009 he was supervising a Metro Response unit. When he heard Officer Hamilton's request that a uniformed officer initiate a traffic stop, he was just a block or two away from the intersection of Oltorf and Douglas Streets, and was therefore able to get there within seconds after he got the call. During the stop, he activated his in-car camera. He was the only officer on the scene whose dashboard video was preserved, although ultimately some six officers and four patrol cars were on the scene.[2]

From the video, which is time-stamped, it is apparent the traffic stop occurred at 12:21 a.m. The Buick had turned into an apartment complex and parked, and at 12:21:43, Sgt. Hanna got out of his vehicle and approached the driver's side of the Buick. Officer Hamilton got out to help and positioned himself on the passenger side of the Buick. Sgt. Hanna asked for and obtained Houston's license and registration, and testified he did not see anything out of the ordinary with either Defendant at this time, although he was more focused on Houston, the driver.[3]

The video shows other officers arrived at the scene around 12:22, less than a minute later. These were Officers Joe Harris and George Blanche, who arrived on the scene within seconds and were followed almost immediately by Officer Vallejo, who is a canine officer and had a narcotics dog

---

[2] The undisputed testimony at the hearing established it was APD's policy at the time that only the senior officer on the scene was required to preserve his or her dashboard videotape. Thus, although other video cameras may have been activated (such as Officer Vallejo's), those videos would have been turned it into the Property Control Room and re-used, rather than turned in for evidence and preserved.

[3] Sgt. Hanna testified he did not ultimately ticket either Defendant; he passed the license and registration documents to other officers and let them continue the investigation. He testified he would have had time to write a citation if he had needed to, as it generally takes about 10 to 15 minutes after pulling over a car to check the driver's license, check for warrants, check for involvement with APD, and then write the citation.

with him.[4]  The narcotics dog is heard barking on the video from about 12:22:53 onward.  Officers Harris and Blanche approached the passenger side of the vehicle, behind Officer Hamilton.  Officer Hamilton testified that as he was standing on the passenger side of the car he was able to see Hemphill face-to-face and at that point he confirmed his identity and the fact Hamilton had arrested him previously on a narcotics-related charge.  Hamilton remembered that on the previous arrest, Hemphill had tried to discard narcotics by swallowing them.

Now, Officer Hamilton testified he saw Hemphill was "making motions" inside the vehicle—which Hamilton described during his testimony as moving and twisting his body in his seat.  Although it did not appear Hemphill was swallowing narcotics, Officer Hamilton observed he was not remaining "still and calm."  Officer Harris also testified he observed Hemphill in the passenger seat making a "large furtive movement" toward the center of his seat, and twisting his body in the seat.  Officer Harris thought, based on his prior experience, that Hemphill was either concealing a weapon or some contraband.  Officer Harris also testified he knew who Hemphill was from seeing his profile as he approached the vehicle.

At 12:22:50, the officers removed both Defendants from the vehicle and placed them in handcuffs.  Officer Harris testified they did so because of Hemphill's movements and because they were in a dangerous, high-crime neighborhood and wanted to make sure the suspects were not armed.  The officers did an immediate visual "frisk" of the vehicle from the exterior to make sure there were no weapons in plain view, which took "a couple seconds."  Officer Harris testified Houston was clenching $40 in his hand, which the officers took into custody.  He told the officers he had

---

[4]The video shows all of the officers arriving on the scene from behind Sgt. Hanna's car.  Thus, it is apparent from the video none of the officers parked to the right of Defendants' car, but all parked to the left of it behind Sgt. Hanna.  Therefore, it is doubtful any of the dashboard videotapes of the other officers would have contained better visual evidence.

approximately $800 total on his person, but when the officers searched him they found $1,090 in small denominations. Upon being questioned about the money, Houston was unable to give any information about his employment or where he had gotten the money. Officer Harris testified the money was suspicious because (1) it was such a large amount in small denominations, (2) Houston had not know how much he had, and (3) he was unable to account for how he had obtained it or produce any receipts or documentation.

At 12:26, the officers closed the doors of the vehicle and Officer Vallejo brought the narcotics dog to sniff around the exterior of the car. Officer Vallejo testified he has been an APD police officer for 9 years, and on that night he was assigned as the Metro Response team's "narcotics canine handler." He and the narcotics dog are both certified, and he testified that since the dog was certified in November 2008, he has worked with him daily on an almost continuous basis. Officer Vallejo began working with him "on the street" on November 20, 2008, and he testified between November 20, 2008 and February 26, 2009, the dog had discovered narcotics on several occasions, and had never "falsely alerted"—i.e., given an alert when no narcotics were actually present.

On the night in question, Officer Vallejo had gotten a call saying officers had identified a suspect who was possibly involved in narcotics activity. He began monitoring the radio, and proceeded to the scene when he heard the traffic stop had been made. He arrived within a matter of seconds after Sgt. Hanna and Officer Hamilton. He testified none of the officers had searched the vehicle before he ran the dog around the exterior of the vehicle at 12:26.

Officer Vallejo can be seen on the video walking around the car several times with the narcotics dog. Although the perspective of the video is from the rear left side of the vehicle, and therefore the front right bumper of the vehicle is not visible, Officer Vallejo testified the dog alerted to a specific location on the front right bumper two separate times within the two or three minute

period they were walking around the car. The first time, the dog began biting the front bumper, which Officer Vallejo knew indicated an alert, but Vallejo continued around the car, as he was trained to do. The second time, the dog made a "stronger hit," biting and scratching the right front bumper.

Officer Vallejo informed the officers the dog had given a positive alert to the front right bumper and at 12:29 the officers opened the doors and trunk and started a search of the car. Officer Vallejo noticed the hood of the car was not "flush," but was raised slightly. He opened the hood and looked inside, and saw a can of brake cleaner on the inside of the bumper in the engine compartment of the car. Aware that narcotics are often hidden in false-bottom cans, he unscrewed the bottom of the can and saw bagged narcotics inside. The can contained 18.8 grams of cocaine and 7 grams of marijuana. Sgt. Hanna also found one white rock of crack cocaine in a crack of the front passenger seat during the search.

## Analysis

I.    **Hemphill's "Standing"**[5]

As an initial matter, the Government stated an oral challenge at the hearing to Hemphill's standing to maintain a motion to suppress, as he was the passenger in the vehicle. In *Brendlin v. California*, the Supreme Court held a passenger with no ownership interest in a vehicle had standing to challenge the length of the passenger's detention following a traffic stop (and thus to challenge

---

[5]Because Fourth Amendment rights are personal rights, which may be enforced only by the person whose rights were violated, the Supreme Court has stated that there is no useful analytical purpose served by considering the matter of standing distinct from the merits of a defendant's Fourth Amendment claim. *United States v. Pack*, 2010 WL 2777061 at *4 (5th Cir. 2010) (citing *Rakas v. Illinois*, 439 U.S. 128 (1978)). But despite this admonishment, courts often refer to the question of whether or not a defendant is asserting a violation of his own Fourth Amendment rights as one of "standing." *See, e.g., United States v. Grant*, 349 F.3d 192, 195-96 (5th Cir. 2003). The Court does so here simply for brevity's sake, and because it is the terminology used in much of the relevant caselaw.

evidence discovered as a result of the allegedly illegal stop) because the stop and the detention that followed constituted a seizure of the persons of everyone in the vehicle.  *See Brendlin v. California*, 551 U.S. 249, 259 (2007*)* ("If either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit[.]") (citation omitted).  Thus, it is likely in this instance that Hemphill has standing to contend that his own prolonged detention after the traffic stop was unlawful, and thus that any evidence resulting from that unconstitutional detention should be suppressed.  However, even assuming *arguendo* Hemphill does have standing, the point is moot—the undisputed factual record in this case supports the denial of his motion to suppress on the ground that his detention was constitutionally justified, as discussed *infra*, and thus the Court need not decide the standing issue.

**II.     Motions to Suppress**

The Fourth Amendment protects individuals from unreasonable searches and seizures.  *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003).  "Traffic stops are considered seizures within the meaning of the Fourth Amendment." *Id.*  It is well-settled courts should analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968).  *See United States v. Pack*, 2010 WL 2777061 at *6 (5th Cir. 2010).  Pursuant to *Terry*, the legality of police investigatory stops is tested in two parts: first, courts examine whether "the officer's decision to stop the vehicle was justified at its inception." *Pack*, 2010 WL 2777061 at *6.  Secondly, courts examine "whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place." *Id*.

With respect to the second prong of the test, an officer's subsequent actions are considered not reasonably related in scope to the circumstances that caused him to stop the vehicle "if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *Id*. "If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id.* In short, once the purposes of the stop are resolved and the officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts. *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003). When making a reasonable-suspicion determination, the Fifth Circuit has said repeatedly courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Grant*, 349 F.3d at 197.

In this case, neither Defendant challenges the validity of the initial traffic stop, and it appears it was justified based on the undisputed testimony. The Fifth Circuit has found no constitutional impediment to a law enforcement officer's request to examine a driver's license and vehicle registration papers during a traffic stop and to run a computer check on both, *United States v. Brigham*, 382 F.3d 500, 507-08 (5th Cir. 2004), which was done in this case by Sgt. Hanna. Furthermore, a police officer may, as a matter of course, order the driver of a lawfully stopped car to exit his vehicle, as well as a passenger, and may inspect the car visually for the purpose of observing weapons or contraband in plain view. *United States. v. Hunt*, 253 F.3d 227, 231 (5th Cir. 2001) (citations omitted). In this case, the officers had more than enough reason to remove Defendants from the car, as at least two officers had observed Hemphill moving and twisting in his seat in an odd manner which

indicated to them he was hiding weapons or contraband, both officers knew Hemphill was a known narcotics dealer, one of the officers had personally been involved in an arrest of Hemphill during which he attempted to swallow narcotics in order to hide them from police, and the stop was made in a dangerous and violent neighborhood at night.

Thus, the only question left is whether or not the officers' subsequent actions were "reasonably related in scope to the circumstances that caused [them] to stop the vehicle in the first place," and whether the officers had developed a reasonable suspicion for the search within the time they were reasonably detaining Defendants. *Pack*, 2010 WL 2777061 at *6. As stated above, when the purposes of a stop are resolved and the officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts. *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003). In this case, the Court finds there is absolutely no evidence the seizure was prolonged unreasonably. Not only had Officer Hamilton observed what he thought was a drug deal, but a narcotics dog arrived on the scene almost immediately after the stop and had made two positive alerts on the vehicle within seven or eight minutes of the vehicle being pulled over by Sgt. Hanna. Although the Court has no doubt that Officer Hamilton's observations at Clicks were sufficient to give rise to a reasonable suspicion of illegal narcotics activity, even if this is not so, the positive alerts by the narcotics dog were ***certainly*** sufficient to give rise to reasonable suspicion on the part of all the officers.

In *Illinois v. Caballes*, the United States Supreme Court considered a case similar to the present case, in which a man was pulled over for a traffic violation by an officer. 543 U.S. 405, 406 (2005). Another officer overheard the transmission on his radio and shortly thereafter arrived at the scene with a narcotics-detection dog. *Id.* The dog sniffed the defendant's vehicle and gave a positive alert, and the officers consequently searched the vehicle and found narcotics. *Id.* The defendant moved to

suppress the seized narcotics; however, the Supreme Court found the evidence had not been obtained unconstitutionally. The Supreme Court concluded a dog sniff is ***not*** a search subject to the Fourth Amendment (because it does not "compromise any legitimate interest in privacy"), and therefore the officers did not need "reasonable suspicion" for the dog sniff to take place. *Id.* at 408-09 (holding "the use of a well-trained narcotics-detection dog...during a lawful traffic stop, generally does not implicate legitimate privacy interests."). The Court recognized a seizure that is justified solely by the interest in issuing a warning ticket to the driver ***may*** become unlawful "if it is prolonged beyond the time reasonably required to complete that mission," but accepted the trial court's conclusion that the detention in that case had not been "prolonged beyond the time reasonably required to complete [the officer's] mission." *Id.* at 407-08. Thus, although the Court made clear the officers could not prolong the traffic stop unreasonably in order to conduct the sniff, the dog sniff itself did not implicate Fourth Amendment concerns. The Court noted the "entire incident"—the traffic stop and drug sniff—had lasted less than ten minutes. *Id.* at 406.

In the present case, the stop and the sniff were conducted in even less than ten minutes. Based on the video, the dog had given two positive alerts by 12:29—about eight minutes after the traffic stop began. The officers already had a strong suspicion of criminal activity even before the stop was initiated, based on Officer Hamilton's observations. The officers observed Hemphill acting in an odd manner and shifting about in his seat which, along with their other knowledge of his identity and his activities that night, further increased their suspicions. Officer Vallejo, who had arrived on the scene almost instantly, had his dog sniff the exterior of the car and the dog quickly gave two positive alerts. At that point, the detention had lasted some eight minutes, which is entirely reasonable for a routine traffic stop. After the dog gave two positive hits, the officers undoubtedly had specific, articulable, objective facts to suggest drug activity, and thus their search of the interior of the vehicle for narcotics

-11-

was based on reasonable suspicion under the totality of the circumstances of the case. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (holding courts making a reasonable suspicion determination "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.").

Therefore, on the basis of all the foregoing, the Court confirms its oral order issued at the hearing: that the motions to suppress urged by Houston and Hemphill are OVERRULED.

**Conclusion**

In accordance with the foregoing,

IT IS ORDERED that Defendant Joe Lee Houston's Motion to Suppress [#16] and Defendant Spencer Hemphill's Motion to Suppress [#52] are OVERRULED.

IT IS FURTHER ORDERED that Defendant Houston's Motion to Sever [#56] is DENIED.  The motion contains no basis for the requested severance aside from a single conclusory sentence; it is merely an exposition on the law.  The Court finds absolutely no grounds for severance in this case, and therefore the motion is OVERRULED.

IT IS FURTHER ORDERED that Defendant Houston's Motion to Continue [#49] is GRANTED, and this case is accordingly set for JURY SELECTION at **9:00 a.m.** on **September 27, 2010**, in Courtroom No. 2, United States Courthouse, 200 West Eighth Street, Austin, Texas, with trial to proceed thereafter.  Any pretrial matters will be heard at 8:30 a.m. that day.

IT IS FURTHER ORDERED that any plea bargain or plea agreement entered into by the parties in this cause shall be made known in writing to this Court within SEVEN (7) DAYS of the date this order is signed.  No plea bargain or plea agreement entered into after this date shall be honored by this Court without good cause shown for delay.

SIGNED this the 16th day of August 2010.

_____
UNITED STATES DISTRICT JUDGE